IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

APPAREL BUSINESS SYSTEMS, LLC,:   CIVIL ACTION
             Plaintiff,       :
                              :
         v.                   :
                              :
TOM JAMES COMPANY, et al.,    :
             Defendants       :   NO. 06-1092

MEMORANDUM AND ORDER

McLaughlin, J.                        March 28, 2008

        The plaintiff, a software company, alleges that the

defendants, two clothing manufacturers, have infringed the

plaintiff's copyright and breached the software license

agreements that they have with the plaintiff.  The plaintiff also

claims unjust enrichment, conversion, and violations of the

Unfair Trade Practices Act in connection with the defendants' use

of its software.  The defendants have filed a motion for summary

judgment, which the Court will grant.  The plaintiff has filed a

partial motion for summary judgment, which the Court will deny.

Both parties have filed motions to strike certain declarations,

which the Court will deny.


I.   Facts

        The Court views the record in the light most favorable

to the non-moving party.[1]  The following facts are undisputed.

### A.    The Parties

The plaintiff, Apparel Business Systems, LLC, ("LLC") provides software and associated services to manufacturers, distributors, and importers in the apparel, textile, and footwear industries.  LLC's software packages help automate many aspects of apparel production, order processing, inventory allocation, purchasing, and accounting.  Compl. ¶ 6; Defs.' Stmt. of Uncontested Facts Ex. A.[2]

Defendant Tom James Company ("Tom James") is a manufacturer and retailer specializing in custom clothing. Defendant Kenneth Gordon/IAG, Inc. ("Kenneth Gordon"), a Tom James subsidiary, makes men's shirts.  Tom James has a number of other subsidiaries who are not parties to the plaintiff's lawsuit.  Some of the subsidiaries are named in the complaint as third-party beneficiaries of the defendants' allegedly wrongful actions.  Compl. ¶ 7-8; Mem. of Law in Support of Defs.' Mot. for

---

[1]    On a motion for summary judgment, a court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

[2]    Hereafter, "Defs.' Fact Stmt."

Summ. J. at 1;[3] Mem. of Law in Support of Defs.' Mot. for
Sanctions Against Pl. and Its Counsel for Litigation Misconduct
and Failure to Have a Reasonable Basis Upon Which To File or
Maintain This Action at 2.[4]

Before describing the interactions between the
plaintiff and the defendants that led to the filing of this
lawsuit, the Court will examine the facts surrounding the
plaintiff's business arrangements and the copyrights at issue.


B.    The Copyrights

The plaintiff, Apparel Business Systems, LLC, claims to
be the successor in interest to Apparel Business Systems, Inc.
("INC").  Apparel Business Systems began as a proprietorship
owned by Marvin and Milton Pasternack, who registered the
fictitious business name in June of 1981.  According to the
Pennsylvania Department of State, INC was incorporated on
November 18, 1982.  Defs.' Sanctions Br. I Ex. P; Ex. T.

The plaintiff claims that the defendants have infringed
two of its copyrights:  U.S. Copyright Certificate of
Registration No. TX-1-129-742 (the "'742 Copyright") and U.S.
Copyright Certificate of Registration No. TX-2-570-536 (the "'536
Copyright").  The plaintiff claims that the licensed software is

----

[3]    Hereafter "Defs.' Summ. J. Br."

[4]    Hereafter "Defs.' Sanctions Br. I."

representative of the copyrighted works.  The plaintiff does not have the deposits made with the Copyright Office for either the '742 Copyright or the '536 Copyright, or copies of those deposits.  George Graham, the plaintiff's CEO, said at his deposition that the plaintiff does not have records of what the software was at the time of the copyright applications.  Compl. ¶ 13; Defs.' Fact Stmt. Ex A. at 37; Ex. E; Ex. G; Ex. H.

According to Garry Reinhard, one of the plaintiff's former employees who helped develop the software at issue, IBM developed custom software for the Pasternacks' apparel business before 1980.  From 1980 to 1982, Reinhard and Paul Harkins, who both worked full time at IBM, rewrote the custom software, which became known as 5796-RKK (V1M0).  "V1M0" stands for "version 1, build 0."  According to Reinhard's declaration, the Pasternacks knew that Reinhard and Harkins were rewriting the software, but they did not supervise or pay them, and no written agreement covered the development or ownership of the software.  Defs.' Fact Stmt. ¶¶ 8-9, 11-13, 15; Ex. C.

The '742 Copyright protects the 5796-RKK (V1M0) software.  According to the application, the work was first published on January 14, 1983.  The author and copyright claimant are listed as Apparel Business Systems.  Under the "name of author" section, the application form asks whether the work was made for hire; the box next to "Yes" is checked.  The application

4

was filed by International Business Machines Corp. ("IBM").  The
application lists IBM as the work's manufacturer, and IBM paid
the registration fee and listed its address as the appropriate
address for correspondence.  Barbara Jones signed the
application, declaring herself the authorized agent of IBM, the
"author, or other copyright claimant, or owner of exclusive
rights."  Defs.' Fact Stmt. Ex. E.

     After 5796-RKK (V1M0) was completed, Reinhard and
Harkins continued to work on the software, revising it and making
enhancements.  Harkins was working full time at IBM while he
revised the software, through most of 1983.  Reinhard also worked
full time at IBM while he revised the software, until late 1984
or early 1985.  Both men became employees of INC after they left
IBM.  INC did not supervise or control Harkins or Reinhard's work
on the software.  Between 1982 and 1988, INC hired a number of
independent contractors to work on the editorial revisions to the
software, including James Lawson and Jean Kopan (both of whom are
current LLC employees), Bill Hafele, Paul Nardi, and Syd Manis.
None had written agreements with INC about the authorship or
ownership of the software.  Defs.' Fact Stmt. ¶¶ 26, 28-29, 31-
37; Ex. C.

     In 1989, INC filed a copyright application (the '536
Copyright) for a work called System 38, editorial revisions to
the '742 Copyright.  Like the '742 Copyright, the '536 Copyright

registration says that the subject work was a work made for hire. Only INC is listed as an author copyright claimant; no individual authors are listed, and IBM does not appear anywhere on the application.  The Copyright Office record for the '536 Copyright lists the current claimant as Apparel Business Systems, Inc. Defs.' Fact Stmt. Ex. H; Ex. M.

The plaintiff has introduced a Bill of Sale and Assignment ("Bill of Sale") that says that "as of January 1, 2003," INC transferred to LLC all assets held at the close of business on December 31, 2002, excluding only:  corporate books and records; those assets set forth on Schedule A; and contracts that by their terms are unassignable without the consent of a third party.  The Bill of Sale is undated and signed on behalf of both INC and LLC by George Graham.  It does not mention any specific assets or intellectual property rights.  The Bill of Sale claims to include "Schedule A   Excluded Assets (to be completed and attached)," but no schedule of excluded assets has been produced.  At oral argument, the plaintiff's counsel said that there either never was a Schedule A or that the plaintiff no longer has it.  Defs.' Sanctions Br. I Ex. Q; Oral Arg. Tr. at 71, Nov. 8, 2007.

The plaintiff has also introduced a Stock Purchase Agreement dated December 29, 1989.  In it, Marvin and Milton Pasternack, Paul Harkins, Garry Reinhard, and Karl S. Johnsson,

6

collectively referred to as the sellers, agree to sell all of
INC's shares to ABS Acquisition Corporation for an aggregate
purchase price of $1,454,500.00.  George Graham signed the
agreement on behalf of ABS Acquisition Corporation.  Section 3.7
of the agreement covers intellectual property rights.  Subsection
(a) says that "[t]he Corporation owns and possesses all
Intellectual Property rights necessary or required for the
conduct of its business as presently conducted or as proposed to
be conducted, which Intellectual Property Rights are identified
in Schedule 3.7."  Schedule 3.7 is not attached to the copy of
the agreement produced by the plaintiffs, nor is there any more
detailed description of the corporation's intellectual property
assets elsewhere in the agreement.  Pl.'s Mem. of Law in Opp. to
Defs.' Mot. for Summ. J. and in Support of Pl.'s Cross-Mot. for
Partial Summ. J. of Copyright Infringement, and in Support of
Pl.'s Mot. to Strike the Decl. of Garry Reinhard or in the
Alternative for Disc. Under Fed. R. Civ. P. 56(f) Ex. 6.[5]

        The plaintiff relies on three previously unproduced
documents in its opposition to the defendants' motion for summary
judgment:  a document called "Confirmation of, Nunc Pro Tunc and
Quit Claim Assignment of Copyright Interest" ("Harkins
Confirmation"); a 1996 Settlement Agreement in Reinhard, et al.
v. Graham, et al., a state court case involving a dispute between

---

        [5]     Hereafter "Pl.'s Opp."

the Pasternack brothers and Graham ("Settlement Agreement"); and
a Final Consent Decree in a 1994 Eastern District of Pennsylvania
case called <u>Apparel Business Systems, Inc. v. Garry Reinhard, et
al.</u> ("Consent Decree").

The plaintiff produced the Harkins Confirmation in
response to the defendants' Motion to Preclude Documents Not
Produced in Accordance With the Court's October 23, 2006, Order
(Docket No. 34) and their Motion To Compel Testimony (Docket No.
36), and after oral argument on January 8, 2007.  Paul Harkins
claims to be the author of computer software programs "developed
for and on behalf of either Apparel Business Systems . . . or
Apparel Business Systems, Inc. . . . which are now the subject of
U.S. Copyright Certificate of Registration No. TX-1-129-742 and
U.S. Copyright Certificate of Registration No. TX-2-570-536
(collectively the "Works")."  Harkins reports that on or before
December 1989 (the date of the Stock Purchase Agreement) he
transferred, assigned, quit claimed, and set over to INC all
rights and interests he then had or would have in the copyrights.
He includes the right to sue for past, present, and future
infringement.  Pl.'s Opp. Ex. 5.

The plaintiff introduced the Settlement Agreement and
the Consent Decree in their March 19, 2007, opposition to the
defendants' motion for summary judgment.  The Settlement
Agreement ended a lawsuit brought by the Pasternacks against INC

in 1992.  The Pasternacks alleged breach of contract, fraud, and other claims related to the transfer of shares from the Pasternacks to ABS Acquisition Corporation on December 29, 1989. INC counterclaimed, also alleging fraud, breach of contract, and related claims.  The Settlement Agreement was signed between February 23, 1996, and March 22, 1996, by Graham, Robert Shallow, James Lawson, and Jean Kopan (as shareholders of INC), and Frederick Santarelli, Marvin Pasternack, and Milton Pasternack. In the Settlement Agreement, Lawson and Kopan agree that ABS is the exclusive owner of the '742 Copyright and the '536 Copyright. Pl.'s Opp. Ex. 8 at 2, 19, 22.

The copy of the Consent Decree that the plaintiff produced is signed and dated only by George Graham as President of INC.  It is not signed or dated by either the judge (Judge Donald W. VanArtsdalen) or by the defendant (Garry Reinhard, either individually or in his capacity as President of Applications Consultants, Inc.).  In the Consent Decree, INC is deemed to be the exclusive owner of the '742 and '536 Copyrights and the defendants agree not to challenge the ownership or validity of the copyrights.  The defendants agree to pay a license fee in order to continue selling their software package. The Consent Decree and settlement terms were ordered kept under seal.  Id. Ex. 7.

The plaintiff has also submitted declarations from two

9

of its employees, Jean Kopan (LLC's president) and James Lawson. Kopan's declaration, signed on March 13, 2007, says that she is familiar with the plaintiff's software that is the subject of the '742 and the '536 Copyrights and that the software package licensed by ABS to its licensees incorporates portions of the copyrighted software protected by both the '742 and the '536 Copyrights.  In an earlier deposition, Kopan testified that she did not know how much the software code changed from the time that she started working at INC until 1989, the time of the second copyright registration.  She also said that she was not aware that an earlier copyright (the '742 Copyright) had been filed before she started working at INC.  Pl.'s Opp. Ex. 3; Defs.' Reply Ex. HH, at 88.

Lawson signed his declaration on May 9, 2007.  He says that Paul Nardi and Syd Manis may have worked on some aspects of software developed by INC, but that he has no knowledge of either of them working on the program licensed by LLC.  Like Kopan, Lawson says that the software package licensed to companies like Tom James and Kenneth Gordon incorporates portions of the software protected by both the '742 and the '536 Copyrights.  In one previous deposition, Lawson testified that he had no knowledge of the work that Manis did, and only knew what Nardi did in the 1990s, not the 1980s, when the software at issue was developed.  In another previous deposition, Lawson testified that

10

there was no way to tell how close the software protected by the
'536 Copyright was to the version INC licensed to Tom James or
Kenneth Gordon.  Pl.'s Opp. to Defs.' M. to Strike Ex. B; Defs.'
M. to Strike Ex. II, at 26, 28, 29, 36, 137-39.

C.   The Tom James and Kenneth Gordon License Agreements

Tom James entered into a software license agreement
with the plaintiff's predecessor in interest, INC, on January 19,
1996.  Tom James used the software for its apparel accessories
operations on an IBM AS/400 Model 200 computer.  At the time that
it started using the plaintiff's software, Tom James was already
using another PC-based solution that ran on FoxPro for its other
operations.  In 1999, Tom James started using the FoxPro solution
for its accessories operation and discontinued use of the INC
software.  The plaintiff concedes that between 1996 and 1999, Tom
James never used the INC software on anything except the licensed
Model 200 machine, never used multiple copies of the software,
and did not disseminate the software to third parties.  Defs.'
Fact Stmt. ¶¶ 44, 46-48, 52; Oral Arg. Tr. at 10, Nov. 8, 2007.

Kenneth Gordon entered into a software license
agreement with INC on April 17, 1996.  The license agreement
said, in part:

Customer agrees that the Software shall be used by
Customer only for the processing of its own accounts
and data, and that Customer will not provide, disclose,
use for the benefit of, or otherwise make available the

11

> software or any part thereof to any other party.
> Customer shall not copy (except to transfer to a hard
> disk or other permanent storage device within the
> Hardware) or permit to exist more than one copy of the
> software, except for one back-up copy of the Software.
> . . . The Software shall be used only on the Hardware
> and at the location set forth on Appendix "B".
> Customer shall not employ or use any additional
> Hardware attachment, features, or devices on or with
> the Hardware or make changes or alterations to the
> Hardware covered hereunder without prior written notice
> to ABS.  In the event the capacity or performance of
> Customer's Hardware is increased, ABS shall receive
> from Customer an additional Software License Fee, not
> to exceed ABS's then current Software License Fee for
> similar Hardware, less the Software License Fee
> previously paid by Customer to ABS with respect to the
> Original Hardware.

Defs.' Fact Stmt. Ex. R, ¶ 1-C.

The license agreement covered a Model 300 computer, but at the time it signed the agreement, Kenneth Gordon was awaiting delivery of a new Model 500 system.  INC installed the software on the Model 300 on April 17, 1996.  On May 29, 1996, INC participated in the installation of the software on Kenneth Gordon's new Model 500 computer.  Although the Model 500 was not covered by the license agreement, an INC employee, Suzette James, confirmed and recorded the model and serial number of the Model 500 during the installation.  Defs.' Fact Stmt. ¶¶ 53, 55-57; Ex. X.

In its opposition to the defendants' motion for summary judgment, the plaintiff says that the software was moved to the Model 500 without the plaintiff's permission or a new license agreement.  The defendants do not contend that there was a new

12

license agreement, but point to Suzette James's involvement in the move to support their contention that the plaintiff knew about and approved the move to the 500.  None of the evidence in the summary judgment record suggests that the plaintiff did not know about the move at the time it happened.  The plaintiff has not produced its customer file on Kenneth Gordon.  According to the declaration of George Graham, LLC's CEO, the plaintiff does not have a formal document retention policy, but timely attempted to locate and preserve all documents relevant to the case. Graham said that LLC lost the Kenneth Gordon file when it moved offices from Conshohocken, Pennsylvania, to Norristown, Pennsylvania, in late 2005.  In his declaration, Graham states that there was no understanding between INC and Kenneth Gordon about the Model 500 computer.  At oral argument, the plaintiff conceded that at least one ABS employee did know about the move to the Model 500 in 1996.  Viewing the facts in the light most favorable to the plaintiff, the Court concludes that the plaintiff knew about the move to the Model 500 computer in 1996. Oral Arg. Tr. at 22, Nov. 8, 2007; Pl.'s Opp. at 34; Ex. 4 ¶¶ 10, 27, 29-32; Ex. 10.

Both the Model 300 and the Model 500 machines are P-20 computers.  IBM uses "P" numbers to designate the processor class for its machines.  The plaintiff does not have a price list for its software, but rather a set of price guidelines that it uses

13

to negotiate with each customer.  The current price guidelines
were last revised in June of 2005.  The price guidelines show
that the plaintiff charges the same price for all P-20 computers.
Defs.' Fact Stmt. ¶¶ 58; Ex. T; Pl.'s Opp. Ex. 4; Ex. 10.

By 1997, Kenneth Gordon had become unhappy with INC's
service and software.  That year, the plaintiff began telling its
customers about Year 2000 ("Y2K") bugs in the software and
offering a software update at no additional charge to customers
who were current on maintenance.  In 1998, while Kenneth Gordon
was current on its maintenance with INC, it received and
installed the Y2K software update.  Defs.' Fact Stmt. Ex. P;
Pl.'s Opp. Ex. 4.

In 1999, Kenneth Gordon wrote to the plaintiff
declining continued maintenance.  INC's president, George Graham,
then sent a letter to Kenneth Gordon raising three issues:
first, the plaintiff claimed that Kenneth Gordon owed it an
additional fee of $72,125.00 for moving the software from the
Model 300 to the Model 500 (this was the first time since the
move three years before, in which INC employee Suzette James had
participated, that the plaintiff had asked for an additional
fee); second, the plaintiff wanted Kenneth Gordon to execute a
new software license agreement; and third, the plaintiff asked
Kenneth Gordon to commit to current and future maintenance
contracts.  Graham's letter offered two options.  The first

14

option deferred the additional fee and offered a 25% discount on all future software installations at Tom James affiliates in exchange for Kenneth Gordon staying on ABS software maintenance for at least two years and executing a software license agreement for the new Y2K software.  The second option reduced the additional fee to $36,062.50 and offered the 25% affiliate discount in exchange for Kenneth Gordon staying on ABS software maintenance for one year and executing the license agreement for the Y2K software.  Defs.' Fact Stmt. Ex. P; Ex. V.

Tom James's Divisional President of Information Services, Brian Podany, wrote back to Graham on May 5, 1999, and clarified that Suzette James of INC had confirmed and recorded the AS/400 Model 500 model number and serial number during the software installation in 1996.  Podany's letter did not refer to INC's two offers.  Kenneth Gordon did not want to continue its relationship with INC and thought that the further license fees and obligations that INC sought were improper.  INC sent Kenneth Gordon several more letters in 1999 and 2000, but Podany's May 5, 1999, letter was the last communication from Kenneth Gordon to INC.  INC's last communication to Kenneth Gordon was a letter from Graham to Sergio Castelina, President of Tom James, on October 10, 2000, asking Castelina to call him in order to avoid legal action.  Defs.' Fact Stmt. Ex. P; Ex. V; Ex. W; Ex. X; Ex. Y; Ex. Z; Ex. AA; Ex. BB.

15

In April, 2001, while downsizing its apparel operation, Kenneth Gordon moved the INC software from the Model 500 computer to a less powerful Model 820 computer.  The Model 820 has a P-10 processor, which is less powerful than the P-20 processors in the Model 300 and Model 500 machines.  Kenneth Gordon did not notify the plaintiff of the move to the Model 820.  The June 2005 price guidelines, which are the only price information in the summary judgment record, show that the plaintiff charges less for software installed on machines with P-10 processors than it does for software installed on P-20 machines.  There is nothing in the summary judgment record about whether the software had to be copied to be put on the 820, or whether a single copy was moved from one machine to another.  Defs.' Fact Stmt. ¶ 70; Ex. P; Ex. T; Oral. Arg. Tr. at 25-26, Nov. 8, 2007.

Kenneth Gordon continues to use the plaintiff's software under the license agreement.  Other than the two moves of the plaintiff's software to different computers (from the Model 300 to the Model 500 in 1996, and from the Model 500 to the Model 820 in 2001), the plaintiff acknowledges that there is no evidence in the summary judgment record of any other unauthorized use, copying, or dissemination by Kenneth Gordon.  Defs.' Fact Stmt ¶ 75; Ex. P; Oral Arg. Tr. at 35, Nov. 8, 2007.

D.  Basis for the Lawsuit

16

In November of 2004, two of the plaintiff's employees
(James Lawson and Damian Kodner) were at a sales meeting in
Birmingham, Alabama, with a prospective customer and a man Lawson
believed to be Randall Spake.  The prospective customer, a man
called "Buddy," represented Prowler Supply Co., which was
considering acquiring ABS software.  Spake, a former employee of
the Hubbard Company, a wholly owned subsidiary of Tom James, was
introduced as being an employee or prospective employee or
consultant for Prowler.  Lawson said that one of the men referred
to Spake as having experience with ABS software (Lawson could not
recall which man made the reference).[6]  Lawson says that he was
surprised when Spake's familiarity with ABS came up because he
was not aware that Hubbard had used ABS software.  Defs.'
Sanctions Br. I, Ex. K.

George Graham, the plaintiff's president, spoke with
Lawson and Kodner after the sales meeting, and reported that
Lawson told him that Spake said that he was "familiar with the
ABS software package because it's everywhere."  According to
Graham's deposition testimony, Lawson understood "everywhere" to
mean the sister companies of Kenneth Gordon.  At Lawson's
deposition, he said that he did not remember Spake or Buddy
saying that ABS software was "everywhere."  Defs.' Fact Stmt. Ex.

---

[6]     According to the defendants, during the time Spake
worked at the Hubbard Company it ran software made by Apparel
Computer Systems, Inc., commonly referred to as "ACS."  Defs.'
Sanctions Br. I at 16.

17

D at 76-77, Ex. I at 37; Pl.'s Opp. Ex. 4 ¶ 22.

In Graham's declaration he said that he conducted his own investigation and discovered a "strong likelihood of a close connection" between Hubbard, Kenneth Gordon, and Tom James.  At oral argument the plaintiff said that Lawson's encounter with Spake in November of 2004, combined with the fact that Kenneth Gordon had not responded to any of the plaintiff's letters or phone calls about the license and maintenance agreements in 1999 and 2000, prompted the plaintiff to file the lawsuit.  Id. Ex. 4 ¶ 22; Oral Arg. Tr. at 34-35, Nov. 8, 2007.


11.   Discovery into the Defendants' Computers

In its opposition to the defendants' motion for summary judgment, the plaintiff argues that it was unable to respond fully to the defendants' claims because it was not allowed to inspect the defendants' computers and source code.  The Court rejects this argument.  The Court has laid out its reasoning in earlier decisions made during and after the discovery period, and has determined that the plaintiff had adequate discovery into the software on the defendants' computers.  Pl.'s Opp. at 2.

The plaintiff filed the case in March of 2006, and the Court ordered discovery completed by January 15, 2007.  A confidentiality order was entered on November 2, 2006.  The defendants filed many motions to compel production of documents

18

and answers to interrogatories, many of which the Court granted.
The Court spent a great deal of time with the parties on
discovery disputes.  Order, Jul. 13, 2006 (Docket No. 8); Defs.'
Mot. to Compel (Docket No. 17); Confidentiality Order, Nov. 2,
2006 (Docket No. 23); Defs.' Mot. to Compel (Docket No. 28);
Defs.' Mot to Compel (Docket No. 36); Order, Jan 8, 2007 (Docket
No. 40); Order, Mar. 7, 2007 (Docket No. 60).

On February 21, 2007, after the close of discovery, the
plaintiff filed a motion to compel inspection of the defendants'
computers and source code and to extend time for the submission
of expert reports.  After reviewing the papers and after two
hearings, on January 8, 2007, and March 22, 2007, the Court ruled
on the motion on April 10, 2007.  Although the plaintiff wanted
an expert to review the computer equipment and source code, it
had not retained an expert or submitted a reasonable search
procedure to the court.  Pl.'s Mot. to Compel Inspection of
Computers (Docket No. 55); Order, Apr. 10. 2007 (Docket No. 71).

The Court ruled that the source code was not part of
the suit:  the plaintiff had not included source code in the
complaint and had objected to the defendants' August, 2006,
request that the source code be produced.  The Court also
rejected the plaintiff's argument that it needed access to the
defendants' active computer system.  The Court concluded that the
search of the active computer files was unnecessary and would

19

impede the defendants' business, and that the back-up tapes accurately reflected the state of the computers at the time the complaint was filed. The plaintiff had not proposed any reasonable, narrowly tailored procedure to perform the search. The Court observed that the plaintiff had performed very little discovery in the year since the case had been filed, relying instead on its plan to gain direct access to the defendants' computers, a plan about which the Court had repeatedly expressed serious concern. Id., Pl.'s Mot. to Compel Inspection of Computers (Docket No. 55).

The defendants' technology officer, Brian Podany, had searched the defendants' computer back-up tapes and reported that tapes showed no unlicensed copies of the plaintiff's software. In its April 10, 2007, Order denying the plaintiff direct access to the computers, the Court pointed out that the plaintiff had not shown why such complete access was necessary when Podany had already searched the back-up tapes: the plaintiff had not argued that Podany's search was deficient or raised questions about the analysis of the back-up tapes. At the March 22, 2007, hearing, the plaintiff's counsel said that the plaintiff never accused Podany of doing the search in a "nefarious" way. Rather, the plaintiff objected to Podany's search because he supervised two subordinates who performed the search, rather than doing it all himself. The Court observed that if the plaintiff had taken

20

Podany's deposition in November of 2006 (when it was first scheduled) it would have learned of the subordinates' role and could have taken their depositions then. Id.; Hearing Tr., Mar. 22, 2007, at 29-30.

The Court ordered the parties to choose a neutral expert to determine whether Podany's search was sufficient, and if not, to provide a written protocol for an appropriate search. The Court proposed a draft engagement letter and the parties went back and forth with changes. Over the late summer and into the fall of 2007, the parties could not agree on an expert. Navigant Consulting, Inc. ("NCI") was retained as an expert in the fall of 2007. Defs.' Mot. to Complete Order Concerning Pl.'s Mot. to Compel Inspection (Docket No. 77); Order, June 15, 2007 (Docket No. 92); Order, Aug. 7, 2007 (Docket No. 104).

NCI reported that the procedures Podany used to perform the search "would have revealed the existence of the ABS software on the specified computers at the time the backups were made." The plaintiff objected to NCI's report, saying that it had been improperly restricted in its search and that information on the defendant's computers could have been manipulated. NCI Report, Oct. 9, 2007 at 1Pl.'s Letter to the Court, Oct. 17, 2007.

NCI reviewed the declarations and depositions of the defendant's employees, visited the Kenneth Gordon facility, and Podany led NCI through the procedures that generated the report.

21

If NCI thought that Podany's search was inadequate or that it had
been inappropriately restricted, the engagement letter instructed
it to provide a protocol for an appropriate search.  NCI did not
provide such a protocol, and concluded that Podany's search would
have revealed the existence of the plaintiff's software.  Order,
June 15, 2007 (Docket No. 92); Order, Oct. 3, 2007 (Docket No.
105); Oral Arg. Tr. at 111-16, Nov. 8, 2007.

        The Court concluded that NCI's report adequately
responded to the plaintiff's objections to Podany's search.


III.   Defendants' Motion for Summary Judgment

        The defendants have moved for summary judgment on all
counts in the plaintiff's complaint:  copyright infringement,
breach of contract, unjust enrichment, and conversion.  The Court
will grant summary judgment for the defendants on all counts.
The complaint also includes a claim under the Unfair Trade
Practices Act, but the plaintiff has withdrawn that claim.  Pl.'s
Opp. at 42; Oral Arg. Tr. at 76, Nov. 8, 2007.


        A.   Copyright Infringement

             1.   Tom James

        The complaint alleges that Tom James has infringed the
plaintiff's copyrights by making unauthorized copies of the
plaintiff's software, disseminating those copies to third


                                22

parties, and using unlicensed modules of the software.  Tom James
used a licensed copy of the plaintiff's software from 1996 to
1999.  At oral argument, the plaintiff conceded that there was no
evidence in the summary judgment record of any unauthorized
copying, dissemination, or use on the part of Tom James.  Compl.
¶¶ 27, 29-30; Defs.' Fact Stmt. ¶¶ 47-48, 52; Oral Arg. Tr. at
10, Nov. 8, 2007.

Although it concedes that there is no evidence of
copyright infringement in the summary judgment record, the
plaintiff claims that infringement has been established as a
matter of law.  In its opposition to the defendants' summary
judgment brief (which is also its cross-motion for partial
summary judgment on copyright infringement), the plaintiff claims
that copyright infringement has been established as a matter of
law because of a reference that the defendants' counsel made to
modifying source code at the oral argument on January 8, 2007.

The Court addressed this issue in its order of April
10, 2007 (Docket No. 71).  The plaintiff did not mention source
code in its complaint, and indeed, when the defendants asked the
plaintiff for the source code in their first request for the
production of documents on August 11, 2006, the plaintiff
objected to the request, saying that it was irrelevant.  After
oral argument on January 8, 2007, the plaintiff's counsel argued
that the plaintiff was entitled to the source code because of the

defendants' "admission" that they had modified the ABS source
code and created an infringing derivative work.  During a hearing
on March 22, 2007, the plaintiff's counsel conceded that the
license agreement stated that the defendants would receive
machine-readable object code, and, for a fee, the source code.
The defendants paid the fee and received the source code, a
common practice that allows customers to tailor a software
program to fit their particular needs.  Defense counsel's
assertion that the defendants had a proprietary interest in the
changes that they were entitled to make to the source code is not
an admission of copyright infringement.  The Court ruled in April
of 2007 that it would not consider source code in the copyright
infringement claim because the plaintiff did not include it in
the complaint and objected to the defendant's request that it be
produced.  Pl's. Opp. at 4-5; Oral Arg. Tr. at 30-31, 93, Jan. 8,
2007; Hearing Tr. at 8-9, Mar. 22, 2007; Order, Apr. 10, 2007
(Docket No. 71).

The Court will grant summary judgment to Tom James on
the copyright infringement count.


### 2.   Kenneth Gordon

The complaint alleges that Kenneth Gordon has infringed
the plaintiff's copyrights by making unauthorized copies of the
plaintiff's software, disseminating those copies to third

24

parties, and using unlicensed modules of the software.  Kenneth
Gordon began using the software in 1996 and has used it on three
machines:  a Model 300, a Model 500, and a Model 820.  The
plaintiff contends that the latter two uses constitute copyright
infringement because they are beyond the scope of the license
agreement.  The Court will address the license agreement issues
more fully below.  Although the plaintiff is correct that
exceeding the scope of a license granted by a copyrightholder may
constitute copyright infringement, breach of a license agreement
alone does not relieve a plaintiff from its burden of showing
that it owns a valid copyright in the software and that protected
elements of the software were copied.  S.O.S., Inc. v. Payday,
Inc., 886 F.2d 1081, 1083-84 (9th Cir. 1989); Gemisys Corp. v.
Phoenix Am., Inc., 186 F.R.D. 551, 562 (N.D. Cal. 1999).

        Section 106 of the Copyright Act confers several
exclusive rights on the owner of the copyright:  copying,
distribution, and the creation of derivative works.  To establish
copyright infringement, a plaintiff must show 1) that it owns a
valid copyright, and 2) that the defendant copied protected
elements of the work.  17 U.S.C. § 106; Feist Publ'ns, Inc. v.
Rural Tel. Serv. Co., 499 U.S. 340, 360 (1991).

        Section 201(a) of the Copyright Act says that a
copyright vests initially in the author or authors of the work.
In the case of a work for hire, the employer or other person for

25

whom the work was prepared is considered the author.  Unless the
parties have expressly agreed otherwise in a signed written
agreement, the employer-author owns the copyright.  17 U.S.C. §
201(a), (b).  All transfers of copyright ownership must be in
writing.  17 U.S.C. § 204(a); MacLean Assocs., Inc. v. Wm. M.
Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 778 (3d Cir. 1991);
Bieg v. Hovnanian Ents., Inc., 157 F. Supp. 2d 475, 479-80 (E.D.
Pa. 2001).

          The defendant contends that the copyright registrations
asserted by the plaintiff are invalid, that the missing copyright
deposits are fatal to the plaintiff's case, and that the
plaintiff does not own the copyrights and therefore lacks
standing to sue.  Defs.' Summ. J. Br. 4-10.

          The Court need not reach the question of whether
Kenneth Gordon has copied protected elements of the plaintiff's
software.  Even taking all inferences in favor of the plaintiff,
the plaintiff cannot make out a claim of copyright infringement
because it cannot establish the first prong:  ownership of the
copyrights at issue.  The Court also need not reach the question
of whether the copyright registrations themselves are valid.
Whether or not the copyrights are valid, the chain of title is so
unclear as to be fatal to the plaintiff's claim.  In addition,
the plaintiff cannot establish that the software used by the
defendants is the software protected by the copyrights at issue,

because it has not produced either the deposits made with the copyright office when the registrations were issued or any other evidence of the subject matter that the copyrights protect.[7]

The plaintiff claims that it owns the '742 Copyright and the '536 copyright either as works for hire or through assignment.  Neither theory establishes the plaintiff's ownership.  There are no work-for-hire documents in the record for either copyright, and the documents that the plaintiff offers to prove assignment are incomplete.  Pl.'s Opp. at 8.

The '742 Copyright protects the 5796-RKK (V1MO) software, developed by Garry Reinhard and Paul Harkins while they were IBM employees.  In the copyright application, Apparel Business Systems is listed as the author and copyright claimant. The '742 copyright is classified as a work for hire.  IBM filed the application and an IBM representative signed it as the "author, or other copyright claimant, or owner of exclusive rights."  The registration is in the name of Apparel Business Systems (the Pasternacks' fictitious business name).

Section 101 of the Copyright Act provides that a work has been made for hire under two circumstances:  "1) a work

---

[7]     The plaintiff has submitted two declarations, from Jean Kopan and James Lawson, to bolster its copyright ownership argument.  As discussed below in Section IV.B addressing the Motions to Strike, the Court finds that the declarations do not help establish ownership of the copyrights.  The declarants lack personal knowledge of the details of the software development, and their previous deposition testimony was inconsistent with the declarations.

prepared by an employee within the scope of his or her
employment; or a work specially ordered or commissioned for use
as a contribution to a collective work . . . if the parties
expressly agree in a written instrument signed by them that the
work shall be considered a work for hire."  17 U.S.C. § 101(1),
(2).  The United States Supreme Court has held that general
agency principles apply in determining whether or not a work was
made within the scope of employment, and has cited factors
including, <u>inter alia</u>, skill required, source of tools, method of
payment, provision of benefits, and tax treatment of the hired
party.  <u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730.
751-53 (1989).

There is no evidence in the record to suggest that the
plaintiff formally employed the two software developers at the
time the copyright was registered, and the plaintiff has not
introduced evidence to support a finding of employment under the
factors outlined in <u>Cmty. for Creative Non-Violence</u>.  Nor is
there evidence of an express written agreement between ABS and
the two software developers, as required by section 101(2).
Reinhard and Harkins worked for IBM, not for ABS, when the
copyright was registered, and from the face of the copyright
registrations, it appears that IBM owns exclusive rights in the
'742 copyright.  Defs.' Summ. J. Br. Ex. E.

The '536 Copyright protects editorial revisions to the

'742 Copyright, a work called System 38.  The registration, filed in 1989, says that the work was made for hire, and only INC appears as an author or copyright claimant.  According to Garry Reinhard, he, Harkins, and five other independent contractors worked on the editorial revisions (Hafele, Manis, Nardi, Lawson, and Kopan).  There are no independent contractor agreements in the record, and the plaintiff has not provided any evidence of their employment under <u>Cmty. for Creative Non-Violence</u>.  Harkins and Reinhard became INC employees in 1983 and in 1984 or 1985, respectively.  The current claimant, according to the Copyright Office records, is Apparel Business Systems, Inc.  Taking all inferences in favor of the plaintiff, the Court finds that there is a material dispute as to the ownership of the '536 copyright. <u>Id.</u> Ex. H; Ex. M; Defs.' Fact Stmt. ¶¶ 28-29, 33.

The plaintiff's second theory of copyright ownership is assignment.  It has introduced three documents that it claims establish that LLC, successor in interest to INC, owns both copyrights: a Stock Purchase Agreement, from 1989; an undated Bill of Sale; and the Harkins <u>nunc pro tunc</u> confirmation, from 2007.  None of these documents establish assignment of the two copyrights.  Under 17 U.S.C. § 204(a), a transfer of copyright ownership is not valid unless the conveyance is in writing and signed by the owner of the rights conveyed.  The terms of the conveyance must be clear, and any ambiguity regarding the

29

transfer must be interpreted in favor of the original copyright
holder.  Bieg, 157 F. Supp. 2d at 480; Cassway v. Chelsea
Historic Props., 1993 WL 64633 (E.D. Pa. Mar. 4, 1993).

The plaintiff claims that the Stock Purchase Agreement,
dated December 29, 1989, confirms that the '742 Copyright had
been validly assigned to it.  Section 3.7 of the agreement covers
intellectual property rights and says that "[t]he Corporation
[INC] owns and possesses all Intellectual Property rights
necessary for or required for the conduct of its business as
presently conducted or as proposed to be conducted, which
Intellectual Property Rights are identified in Schedule 3.7."
Schedule 3.7 is missing from the copy of the agreement that the
plaintiff introduced, and it appears nowhere else in the record.

There are several problems with treating the Stock
Purchase Agreement as evidence of assignment.  First, as
discussed above, the plaintiff has not established that INC owns
the '742 Copyright.  No evidence in the record suggests that IBM,
which owns exclusive rights in the copyright, ever transferred
those rights to INC.  Without evidence that INC owns the
exclusive rights, INC may not assign the copyright to ABS
Acquisition Corporation.  Second, the agreement contains no
language of assignment or transfer; rather, it states that INC
owns all the intellectual property rights that it needs to
conduct business.  Third, the missing Schedule means that there

30

is no evidence in the record as to what intellectual property INC claimed to own when its shares were sold to ABS Acquisition Corporation.  According to the Copyright Act and the case law, transfer documents must be clear, signed, and in writing.  Pl.'s Opp. at 9, Ex. 6.

The plaintiff cites <u>Billy-Bob Teeth v. Novelty, Inc.</u>, 329 F.3d 586, 591 (7th Cir. 2003) for its argument that the defendants do not have standing to challenge the ownership of the copyright.  In that case, both the owner of the copyright and the transferee were parties to the transfer agreement.  In this case, the author of the copyright is listed as the ABS proprietorship and the owner of exclusive rights is listed as IBM.  Neither is a party to the agreement.  The defendants have challenged the agreement on the basis that the plaintiff's predecessor in interest, INC, never owned the copyright to begin with and so could not have assigned it to the plaintiff.  Part of their defense to the claim of copyright infringement is that the plaintiff does not own the copyrights at issue, and they are entitled to challenge the validity of the document that the plaintiff put into evidence to establish ownership.

The second document that the plaintiff has introduced to establish ownership is an undated document called "Bill of Sale and Assignment."  It is signed on behalf of both LLC and INC by George Graham.  The Bill of Sale says that "as of January 1,

2003," INC transferred to LLC all of its assets, except for corporate books, unassignable contracts with third parties, and a list of excluded assets set forth on Schedule A. The Bill of Sale mentions no specific assets or intellectual property rights. It claims to include "Schedule A – Excluded Assets (to be completed and attached)," but neither party has entered such a schedule in to the record. At oral argument, plaintiff's counsel said that there either never was a Schedule A or that the plaintiff no longer has it. Defs.' Sanctions Br. I Ex. Q; Oral Arg. Tr. at 71, Nov. 8, 2007.

The Bill of Sale fails to establish the plaintiff's ownership of the copyrights at issue. The statute and the case law require that documents assigning copyrights be clear as to what is being transferred. The Bill of Sale is fatally unclear, as it refers to a schedule of excluded assets that is not in the record. Even with all inferences in the plaintiff's favor, this is an insurmountable hurdle to establishing ownership. See Broadcast Music, Inc. v. Airhead Corp., No. 90-0431, 1990 WL 1239531, at *2 n.5 (E.D. Va. Dec. 27, 1990) (finding that a missing schedule in a copyright assignment was fatal to the chain of title).

The plaintiff produced the third document, the Harkins Confirmation, in response to two motions by the defendant and after oral argument on January 8, 2001. In the confirmation,

Paul Harkins, one of the original software developers, claims to be the author of the software protected by the '742 and '536 Copyrights.  The document says that on or before December 1989 (the date of the Stock Purchase Agreement) he transferred, assigned, quit claimed, and set over to INC all rights and interests he then had or would have in the copyrights.  Pl.'s Opp. Ex. 5.

The Harkins Confirmation does not solve the plaintiff's ownership problems.  First, the parties do not dispute that Harkins was not the only person to develop the software.  Garry Reinhard was also involved from the beginning.  It is unclear how Harkins, as a co-developer, can assign more than his share of ownership in the work.  Second, as discussed above, the '742 copyright was a work for hire, and from the copyright registration it appears that IBM owns the exclusive rights.  Harkins cannot assign, transfer, or quitclaim rights that are not his to begin with.  Defs.' Fact Stmt ¶¶ 9-10.

The plaintiff has produced two documents from other legal proceedings to support their ownership claims.   The Settlement Agreement, from 1996, governs the disposition of a case brought by the Pasternacks against INC.  The non-compete clause in the agreement states that Lawson and Kopan agree that ABS is the exclusive owner of all right, title, and interest to the '742 and '536 Copyrights and that Lawson and Kopan claim no

right to them.  Lawson and Kopan are employees of the plaintiff;
their previous claims to the copyrights are not at issue here.
The fact that two non-parties agreed that the plaintiff owned the
copyrights as part of a non-compete clause in a Settlement
Agreement between the plaintiff and two other non-parties has no
bearing on the Court's summary judgment decision.

          The Consent Decree purporting to resolve the 1994 case
of Apparel Business Systems, Inc. v. Garry Reinhard and
Applications Consultants, Inc. does not establish ownership of
the copyrights.  The copy produced by the plaintiff is signed
only by one party, George Graham, and not by either the judge or
by Reinhard.  The Consent Decree says that TNC owns the '742 and
'536 Copyrights and that Reinhard infringed the copyrights.  Like
the Settlement Agreement, the Consent Decree governs the
relationship between its signatories and has no effect on non-
parties.  See, e.g., SeaLand Servs., Inc. v. Gaudet, 414 U.S.
573, 593 (1974).  Even assuming that the Consent Decree binds
Reinhard, an assumption the Court hesitates to make because
Reinhard's signature does not appear on the copy in the summary
judgment record, Reinhard is not a party to the current
litigation, and his acknowledgment of ownership and infringement
has no bearing on this case.

          Even if the plaintiffs could establish ownership, there
is no evidence in the record to establish the subject matter

protected by the '536 and '742 Copyrights.  This means that there
is no evidence that the software on Kenneth Gordon's machines is
subject to the two copyrights.  Without such evidence, the Court
cannot conclude, even taking all inferences in the plaintiff's
favor, that Kenneth Gordon infringed either of the copyrights
when it moved the software in 1996 and in 2001.  The plaintiff
argues, correctly, that it does not need to provide the deposit
in order to prove infringement.  Some evidence of the copyright's
subject matter, however, is required.  See F.W. Woolworth Co. v.
Contemp. Arts, Inc., 193 F. 2d 162, 165 (1st Cir. 1951); Gerlach-
Barklow Co. v. Morris & Bendien, Inc., 23 F.2d 159, 162 (2d Cir.
1927); Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc., 831 F.
Supp. 1516, 1529 (D. Colo. 1993) (observing that the plaintiff
had initially waived its copyright claim when it could not locate
the original version of what it had copyrighted).  The plaintiff
has neither the deposits nor copies of the deposits, and George
Graham, the plaintiff's CEO, admitted at his deposition that the
plaintiff has no records of what the software was at the time the
copyright applications were filed.  Defs.' Summ. J. Br. Ex. A at
37; Ex. E; Ex. G; Ex. H.

        The plaintiff has the burden of proving ownership of
the copyrights and that the allegedly infringing material is the
same as that protected by the copyrights.  The plaintiff here
cannot do that, and the Court will grant summary judgment to

Kenneth Gordon on the issue of copyright infringement.

### B.   Breach of Contract

#### 1.   Tom James

The complaint alleges that defendant Tom James violated its license agreement by using the software on upgraded hardware, using the software on multiple computers, and disseminating the software to third parties.  Tom James licensed the plaintiff's software for its apparel accessories business in 1996, and used the software on the AS/400 Model 200 computer specified in the license agreement.  Tom James stopped using the plaintiff's software in 1999, when it moved its accessory operations over to a FoxPro-based software that it had developed in house.  The plaintiff conceded at oral argument that there was no evidence in the summary judgment record of any unauthorized copying, dissemination, or use of the plaintiff's software by Tom James. Compl. ¶¶ 35-36, 38, 39; Defs.' Fact Stmt. ¶¶ 44, 46-48; Oral Arg. Tr. at 10, Nov. 8, 2007.

In addition, the statute of limitations has run on the breach of contract claim against Tom James.  Tom James stopped using the plaintiff's software in 1999.  The plaintiff filed suit on March 13, 2006.  The statute of limitations for contract claims in Pennsylvania is four years.  42 Pa. Cons. Stat. § 5525; Gustine Uniontown Assoc., Ltd. v. Anthony Crane Rental, Inc., 842

A.2d 334 (Pa. 2004).

The Court will grant summary judgment to defendant Tom James on the breach of contract claim.


2.   Kenneth Gordon

Defendant Kenneth Gordon entered into a license agreement with the plaintiff on April 17, 1996, and still uses the software today.  The agreement said that Kenneth Gordon would use the software on a Model 300 computer, and the plaintiff participated in the installation of the software on the Model 300.  Kenneth Gordon moved the software to two different machines:  to a Model 500 machine on May 29, 1996 (six weeks after the installation on the Model 300, with the plaintiff's assistance), and then to a Model 820 machine in April 2001.  The plaintiff alleges that these two moves breach the license agreement.

> The software license agreement says:
>
> The Software shall be used only on the Hardware and at the location set forth on Appendix "B." . . . Customer shall not . . . make changes or alterations to the Hardware covered hereunder without prior written notice to ABS.  In the event the capacity or performance of Customer's Hardware is increased, ABS shall receive from Customer an additional Software License Fee, not to exceed ABS's then current Software License Fee for similar Hardware, less the Software License Fee previously paid by Customer to ABS with respect to the Original Hardware.

No Appendix B appears in the copy of the Kenneth Gordon software

37

license agreement in the record, but Appendix A lists prices "based on machine type AS/400 9406-300 2040 processor." None of the parties argue that the license agreement, as written, covers any machine other than the Model 300. Defs.' Fact Stmt. ¶¶ 53-54, 70; Ex. R § 1(b), App'x A; Compl. ¶¶ 42-45.

According to the defendants, Kenneth Gordon was awaiting delivery of a Model 500 computer at the time it signed the agreement, and the parties agreed that the Model 500 would run the plaintiff's software once the new machine arrived. Whether or not there was an agreement about the Model 500 ahead of time, one of the plaintiff's employees, Suzette James, participated in the installation of the software on the Model 500 on May 29, 1996, six weeks after the agreement was signed. James confirmed and recorded the model and serial number of the Model 500 machine. At oral argument, the plaintiff conceded that at least one of its employees knew of the move to the Model 500 machine at the time of the move. Defs.' Fact Stmt. ¶¶ 53-54, 56-57; Oral Arg. Tr. at 22, Nov. 8, 2007.

Despite having been involved in the installation of the software on the Model 500, the plaintiff did not seek any additional license fees for what it calls the "upgrade" until three years later. In 1999, the plaintiff sought a multi-year maintenance agreement and Kenneth Gordon balked at extending the maintenance contract, because it had been dissatisfied with the

plaintiff's service.  The plaintiff offered to waive some of its claimed upgrade charges if Kenneth Gordon agreed to sign up for the extended maintenance contract, but Kenneth Gordon did not respond.  Defs.' Fact Stmt. ¶¶ 56-57, 63-65, Ex. V.

The Model 300 and Model 500 machines both have P-20 processors.  According to the plaintiff's price guidelines (the only information in the summary judgment record as to what the plaintiff charges for its software), the plaintiff charges the same amount for all P-20 machines.  Defs.' Fact Stmt. Ex. T; Ex. R.

In April of 2001, in the process of downsizing its apparel operations, Kenneth Gordon moved the software from the Model 500 P-20 machine to a Model 820 machine, which has a less powerful P-10 processor.  The defendants acknowledged at oral argument that the plaintiff was not aware of the move from the Model 500 to the Model 820.  According to the plaintiff's price guidelines, software for P-10 computers cost less than software for P-20 computers.  Defs.' Fact Stmt. ¶ 70, Ex. P ¶ 34, Ex. T; Oral Arg. Tr. at 19, Nov. 8, 2007.

The plaintiff argues that both of the software moves – to the Model 500 and to the Model 820 – breach the license agreement.  Under Pennsylvania law, to make out a cause of action for breach of contract, a plaintiff must establish:  1) the existence of a contract; 2) a breach of a duty imposed by the

contract; and 3) damages resulting from the breach.  <u>Halstead v.</u>
<u>Motorcycle Safety Found., Inc.</u>, 71 F. Supp. 2d 455, 458 (E.D. Pa.
1999); <u>Corestates Bank v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa.
Super. 1999).  The Kenneth Gordon license agreement requires that
the customer not change the hardware covered by the license
agreement without prior written notice to the plaintiff.  The
customer cannot copy the software, except to make a backup copy.
INC is entitled to an extra fee "in the event the capacity or
performance of Customer's Hardware is increased."  Defs.' Fact.
Stmt. Ex. R § 1(b).

Taking all inferences in favor of the plaintiff, the
plaintiff has not made out a claim for breach of contract on the
move from the Model 300 to the Model 500.  There is a dispute as
to whether the plaintiff and Kenneth Gordon agreed in advance
that the software would be moved, but it is not material.  The
plaintiff participated in the software move only six weeks after
it had installed the software on the Model 300.  The plaintiff's
employee, Suzette James, recorded the model number and serial
number of the new computer.  The plaintiff not only had notice of
the move, but actively participated in it.[8]

_____

[8]     Even if the plaintiff could establish all elements of
breach of contract, it is far too late to bring the claim arising
from the move to the model 500.  The Pennsylvania statute of
limitations for claims arising out of breach of contract is four
years.  The plaintiff had notice of the move to the Model 500 in
1996, and it filed suit in 2006.  If the plaintiff did not have
notice in 1996, it certainly had notice in 1999, when it
threatened Kenneth Gordon with additional fees unless Kenneth

Even if the defendant had breached the notice clause of the contract, the plaintiff cannot make out any damages for the breach.  The contract calls for an additional software license fee only if the capacity or performance of the hardware is increased.  The Model 300 and the Model 500 both have P-20 processors and therefore have the same capacity and level of performance.  The only information in the record about the plaintiff's prices says that the plaintiff charges the same amount for all P-20 machines.  Even if the plaintiff had not participated in the software move to the Model 500, no extra fee would have been due under the contract.  Therefore, the plaintiff cannot make out damages, the third prong of the breach of contract action.  Defs.' Fact Stmt. Ex. R; Ex. T.

The damages issue also defeats the plaintiff's claim as to the move from the Model 500 to the Model 820, even taking all inferences in favor of the plaintiff.  Although the plaintiff did not know about the move, the price guideline says that the plaintiff charges less for P-10 machines like the Model 820 than it does for P-20 machines like the Model 300 and Model 500.  No extra fee would have been due under the contract, and the plaintiff cannot make out damages.  Id. Ex. T.

The plaintiff conceded at oral argument that there is

---

Gordon extended its maintenance agreement.   42 Pa. Cons. Stat. § 5525; Gustine Uniontown Assoc., Ltd. v. Anthony Crane Rental, Inc., 842 A.2d 334 (Pa. 2004).

no unauthorized copying, dissemination, or use by Kenneth Gordon
other than the two instances previously discussed.  Oral Arg. Tr.
at 35, Nov. 8, 2007.

The Court will grant summary judgment to the defendants
on both breach of contract claims.


C.   Unjust Enrichment

The plaintiff pled unjust enrichment in the
alternative to breach of contract.  The Court has granted summary
judgment to the defendants on the breach of contract claims;
however, unjust enrichment is not available as an alternative
pleading when a written agreement governs the relationship
between the parties.  See Ne. Fence & Iron Works, Inc. v. Murphy
Quigley Co., Inc., 933 A.2d 664, 669 (Pa. Super. 2007) ("A cause
of action for unjust enrichment arises only when a transaction is
not subject to a written or express contract."); Villoresi v.
Femminella, 856 A.2d 78, 84 (Pa. Super. 2004).  The defendant
does not argue that the license agreement was invalid, and both
parties agree that the license agreements govern their
relationship.  The Court will grant summary judgment to the
defendant on the unjust enrichment claim.


D.   Conversion

The plaintiff claims that the defendants have converted

42

copies of the software.  In its opposition to the defendants'
motion for summary judgement, the plaintiff says that the
defendants "have treated the Software as their own by copying or
distributing any portion of the ABS source code to any other
computers including those of non-licensees."  It is unclear to
the Court whether the plaintiff claims conversion in the
copyrights or in the software; the Court will address both.[9]
Compl. ¶¶ 53-55; Pl.'s Opp. at 39.

Under Pennsylvania law, conversion is a tort by which a
defendant deprives the plaintiff of his right to a chattel or
interferes with the chattel without the plaintiff's consent and
without lawful justification.  Conversion, which initially
applied only to tangible property, has expanded from its roots in

---

[9]     Neither party raises the issue of preemption, so the
Court will not decide whether the plaintiff's claim for
conversion of software is preempted by the Copyright Act.  The
sole protection for works that fall within the general subject
matter of copyright is an action for copyright infringement.  17
U.S.C. § 301.  Computer programs, including software, are
protected under the Copyright Act.  Id. § 101.  The plaintiff's
conversion claim arises from the alleged copying and misuse of
the work, which is equivalent to a copyright claim.  The
plaintiff's claim does not have an extra element (such as breach
of trust) that takes it beyond the scope of copyright protection.
See Dun & Bradstreet Software Servs., Inc. v. Grace Consulting,
Inc., 307 F.3d 197, 2-16-18 (3d Cir. 2002).  Most courts that
have addressed the question have found such software conversion
claims preempted.  See U.S. ex rel Berge v. Bd. of Trustees of
the Univ. of Ala., 104 F.3d 1453, 1463 (4th Cir. 1997); Daboub v.
Gibbons, 42 F.3d 285, 289 (5th Cir. 1995); Meridian Project Sys.,
Inc. v. Hardin Construction Co., LLC, No. 04-2728, 2006 WL
1062070 (E.D. Cal. Apr. 21, 2006); Vigilante.com, Inc. v. Argus
Test.com, No. 04-413, 2005 WL 2218405 (D. Or. Sept. 6, 2005);
Firyooze v. Earthlink Network, 153 F. Supp. 2d 1115, 1124 (N.D.
Cal. 2001).

the common law, and the Pennsylvania Superior Court has noted
that various forms of property may be converted.  The conversion
of intangible property is limited, however, to the kind of
intangible rights that are customarily merged in, or identified
with, a particular document (for example, a deed or a stock
certificate).  Famology.com Inc. v. Perot Sys. Corp., 158 F.
Supp. 2d 589, 591 (E.D. Pa. 2001); Northcraft v. Michener, 466
A.2d 620, 625 (Pa. Super. 1983).

        The plaintiff's conversion claim fails for a number of
reasons.  As discussed above, the plaintiff has not established
that it owns the copyrights that protect the software.  Without
ownership, the plaintiff has no standing to make a conversion
claim.  There are also doctrinal reasons why the plaintiff's
conversion claim cannot stand.

        Copyrights are not the kind of intangible rights that
customarily merge in a particular document, and are not subject
to conversion under Pennsylvania law.  The rights associated with
copyright ownership are not embodied in the physical paper of the
copyright registration; rather, those rights arise as soon as the
work is fixed in a tangible medium of expression.  17 U.S.C. §§
102(a), 408; Neles-Jamesbury, Inc., v. Bill's Valves, 974 F.
Supp. 979, 982 (S.D. Tex. 1997).

        Software is not the kind of property subject to a
conversion claim, either.  As discussed in footnote 9, supra,

44

most courts faced with software conversion claims have found

those claims preempted and have not discussed whether software is

the kind of intangible property subject to conversion.  One court

that did discuss the intangible property issue granted summary

judgment to the defendant, saying that it was doubtful that

images copied from the plaintiff's software amounted to

"chattel," or that the copying deprived the plaintiff of the use

of his own software.  Clarity Software LLC v. Allianz Life Ins.

Co. of N. Am., No. 04-1441, 2006 WL 2346292, at *12 (W.D. Pa.

Aug. 11, 2006).  Courts in the Eastern District of Pennsylvania

have found that domain names and satellite signals are not

subject to conversion because they are not types of intangible

property that merge with particular documents.  Famology.com Inc.

v. Perot Sys. Corp., 158 F. Supp. 2d 589, 591 (E.D. Pa. 2001);

DirecTV, Inc. v. Frick, No. 03-6045, 2004 WL 438663, at *2-3

(E.D. Pa. Mar. 2, 2004).

        The plaintiff cites a case in which a court granted

summary judgment to the plaintiff on a software conversion claim.

Stenograph, L.L.C. v. Sims, No. 99-5354, 2000 WL 964748 (E.D. Pa.

July 12, 2000).  The defendant in that case was found liable for

conversion for taking and refusing to return a software key, a

physical object that had to be inserted into the machine in order

to run the software.  Id. at *3.  Stenograph is not applicable to

a situation like the one here:  there is no physical object

45

required to operate the plaintiff's software; the defendants have not carried off a disk containing the plaintiff's program and refused to give it back.  The plaintiff's rights in its intangible property, the software, are not embodied in a particular document, and the software is not subject to conversion.

Because neither the copyrights nor the software at issue in the case are subject to conversion, the Court need not decide whether the plaintiff's conversion claim is barred by the gist of the action doctrine.  The Court will grant summary judgment to the defendant on the conversion claim.

IV.   Plaintiff's Cross-Motion for Partial Summary Judgment

The plaintiff has filed a cross-motion for partial summary judgment on copyright infringement.  It contends that copyright infringement has been established as a matter of law because the defendants admitted at the oral argument on January 8, 2007, that they modified the source code of the plaintiff's software.  Pl.'s Opp. at 4.

As discussed in Section III.A above, and in the Court's order of April 10, 2007 (Docket No. 71), the defendants purchased the source code from the plaintiff in order to modify the software to better suit their needs.  This use was contemplated by the license agreement, and the plaintiff conceded during a hearing on March 22, 2007, that the agreement stated that the

46

defendants would receive the source code for an additional fee. The reference by the defendants' counsel to modifying source code was not an admission of copyright infringement, and the Court's April 10, 2007, order makes clear that the Court will not consider source code as part of the infringement claim. Id. at 4-5; Oral Arg. Tr. at 93, Jan. 8, 2007; Hearing Tr. at 13, Mar. 22, 2007; Order, Apr. 10, 2007 (Docket No. 71).

Additionally, as discussed above, the plaintiff has not established that it owns the '742 and '536 Copyrights, and so does not have standing to sue for copyright infringement.

The Court will deny the plaintiff's motion for partial summary judgment on copyright infringement.

V.   Motions to Strike

Both parties have filed motions to strike. The plaintiff has moved to strike the declaration of Garry Reinhard. The defendants have moved to strike the declarations of George Graham, Jean Kopan, and James Lawson. The Court will deny all of the motions to strike, and will give weight to the affidavits only to the extent they are based on personal knowledge.


A.   The Reinhard Declaration

Garry Reinhard helped develop the software at issue, both as an IBM employee in the early 1980s and as an employee of the plaintiff. His February 7, 2007, declaration discusses the

47

development of the software.  Reinhard is named in two documents
that the plaintiff has introduced into the summary judgment
record.  Reinhard signed the Stock Purchase Agreement as one of
the sellers of INC to ABS Acquisition Corporation.  The Agreement
claims that INC owned all intellectual property rights it needed
to conducts its business, but there is no language of assignment
or transfer and the document is missing the schedule that lists
the intellectual property rights at issue.  The Consent Decree
ended a lawsuit between INC and Reinhard, and Reinhard
acknowledged that INC owned the '742 and '536 Copyrights and that
he had infringed them.  The copy in the summary judgment record
is signed only by George Graham, not by Reinhard or by the
presiding judge.  Defs.' Fact Stmt. Ex. C; Pl.'s Opp. Ex. 6; Ex.
7.

        The plaintiff argues that the Court should strike
Reinhard's declaration because it contradicts the Stock Purchase
Agreement and the Consent Decree in which Reinhard affirmed the
plaintiff's ownership of the '742 and '536 Copyrights.  The
plaintiff claims that Reinhard is incompetent to provide
testimony challenging the ownership of the copyrights at issue
and that Reinhard has perjured himself.  Pl.'s Opp. at 14; Defs.'
Fact Stmt. Ex. C.

        Neither of these documents prevents Reinhard from
testifying about the development of the copyrights at issue.  In

his declaration, Reinhard relates the factual history of the
development of the software called 5796-RKK (V1M0) and System 38,
including the names of the people involved in the project, where
they worked, and the date each project was completed. Reinhard
does not mention the '742 Copyright or the '536 Copyright and
makes no factual or legal assertions about the ownership of the
copyrights. Reinhard was involved with the development of the
software at issue from its beginnings in the early 1980s through
several revisions in the late 1980s. He is competent to provide
testimony on the subject.

The Court will deny the motion to strike the
declaration of Garry Reinhard.


B.    The Kopan and Lawson Declarations

Jean Kopan is currently the plaintiff's president. In
her March 13, 2007, declaration she says that she is familiar
with the plaintiff's software that is the subject of the '742 and
the '536 Copyrights and that the software package licensed by the
plaintiff to its licensees incorporates portions of the
copyrighted software protected by both the '742 and the '536
Copyrights. In an earlier deposition, Kopan testified that she
did not know how much the code changed from the time that she
started working at INC until 1989 (when the '536 Copyright was
registered). She also said that she was not aware that an

49

earlier copyright (the '742 Copyright) had been filed before she
started working at INC.  Pl.'s Opp. Ex. 3; Defs.' Reply Ex. HH,
at 88.

James Lawson has been an employee of the plaintiff
since 1992.  In his May 9, 2007, declaration he says that Paul
Nardi and Syd Manis may have worked on some aspects of software
developed by INC, but that he has no knowledge of either man
working on the program licensed by LLC.  Like Kopan, Lawson says
that the software package licensed to companies like Tom James
and Kenneth Gordon incorporates portions of the software
protected by both the '742 and the '536 Copyrights.  In one
previous deposition, Lawson testified that he had no knowledge of
the work that Manis did, and only knew what Nardi did in the
1990s, not the 1980s, when the software at issue was developed.
In another previous deposition, Lawson testified that there was
no way to tell how close the software protected by the '536
Copyright was to the version INC licensed to Tom James or Kenneth
Gordon.  Pl.'s Opp. to Defs.' M. to Strike Ex. B; Defs.' M. to
Strike Ex. II, at 26, 28, 29, 36, 137-39.

The defendants argue that the Lawson and Kopan
declarations are inadmissible because they contradict prior sworn
testimony.  The Court will not strike the declarations.  Rather,
the Court will consider them under the standard laid out in Fed.
R. Civ. Pro. 56(e), which requires that declarations be made upon

personal knowledge.  The breadth and depth of Lawson and Kopan's
personal knowledge has been demonstrated by their depositions.
The depositions show that both Lawson and Kopan lack personal
knowledge of the details of the software development, and their
declarations are too general to provide a sufficient basis to
oppose summary judgment.

The Court will deny the defendants' motion to strike
the Kopan and Lawson declarations.


C.   The Graham Declaration

In his March 16, 2007, declaration, George Graham
testifies that the plaintiff learned through a November, 2004,
encounter with a former Hubbard employee, Randall Spake, that the
plaintiff's software was used at Hubbard and "was everywhere."
As discussed above, Graham learned of this encounter from James
Lawson, who denied at his deposition that Randall Spake ever said
that the ABS software was "everywhere."  Graham also testifies in
the declaration that LLC timely attempted to locate and preserve
all documents relevant to the case and that "it would be untrue
to state" that LLC did not search for relevant documents and e-
mails.  Graham reported that LLC lost the Kenneth Gordon file in
an office move in late 2005.

In the plaintiff's 30(b)(6) deposition, taken in
October of 2006, Graham testified that he did not know the


51

specific steps the plaintiff took to preserve e-mail or other documents, and that he did not know when the Kenneth Gordon file went missing.  Defs.' Fact Stmt. Ex. I at 37; Pl.'s Opp. Ex. 4 ¶¶ 22, 28-30; Defs.' Mot. to Strike Ex. KK at 68-69; Ex. LL at 78-81; Ex. MM at 46-47.

The defendants seek to strike the March 16, 2007, declaration of George Graham for lack of personal knowledge and because his declaration testimony is inconsistent with previous deposition testimony.  As with the Kopan and Lawson declarations, the Court will not strike the Graham declaration, but rather evaluates the declaration under the personal knowledge requirement of Rule 56(e).

The Court will deny the defendant's motion to strike the Graham declaration.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

APPAREL BUSINESS SYSTEMS, LLC, :    CIVIL ACTION
                    :
         v.         :
                    :
TOM JAMES COMPANY, et al.,   :    NO. 06-1092

## ORDER

AND NOW, this 28th day of March, 2008, upon consideration of the defendants' motion for summary judgment (Docket No. 53), the plaintiff's cross-motion for partial summary judgment and motion to strike (Docket No. 66), and the defendants' motion to strike (Docket No. 73), it IS HEREBY ORDERED that:

1.   The defendants' motion for summary judgment is GRANTED;

2.   The plaintiff's cross-motion for partial summary judgment and motion to strike the declaration of Garry Reinhard is DENIED;

3.   The defendants' motion to strike improper testimony and precluded documents is DENIED.

Judgment is hereby entered for the defendants and against the plaintiff.

BY THE COURT:

MARY A. McLAUGHLIN, J.